**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| **GINA VANCAMP, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF BRIAN MCCOURRY**<br>**1007 Foxcroft Lane**<br>**Baltimore, Maryland 21221**<br>**(Baltimore County)** | |
| **and** | |
| **ISIS WEAVER, AS NEXT FRIEND OF N.W., A MINOR CHILD**<br>**56 Blackfoot Court**<br>**Baltimore, Maryland**<br>**(Baltimore County)** | **Civil No.:** |
| **and** | |
| **BRIAN R. MCCOURRY, SR.**<br>**7932 Berk Lane**<br>**Rosedale, Maryland 21237**<br>**(Baltimore County)** | |
| **and** | |
| **TO THE USE OF:**<br>**SHAKIRA WHITE, AS NEXT FRIEND OF B.M., A MINOR CHILD**<br>**92 Benoni Circle**<br>**Middle River, Maryland 21220**<br>**(Baltimore County)** | **JURY TRIAL DEMANDED** |
| **and** | |
| **TO THE USE OF:**<br>**SABRINA TORES**<br>**2333 Albury Avenue**<br>**Deltona, Florida 32738** | |
| **Plaintiffs,** | |

**v.**

**BALTIMORE COUNTY,
MARYLAND**
**Serve:**
>    **James R. Benjamin, Jr., Esq.**
>    **County Attorney**
>    **Historic Courthouse**
>    **400 Washington Avenue**
>    **Towson, MD 21204**

**and**

**DETECTIVE J. TRENARY #05232**
**Individually and in his Official Capacity as**
**a Baltimore County Police Officer**
**6424 Windsor Mill Road**
**Gwynn Oak, MD 21207**
**(Baltimore County)**

**Defendants.**

---

<u>**COMPLAINT AND JURY DEMAND**</u>

Plaintiff, Gina Vancamp, as Personal Representative of the Estate of Brian Roger McCourry, through counsel, sues Defendants Baltimore County, and Officer J. Trenary in his official and individual capacity.

<u>**INTRODUCTION**</u>

*The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by shooting him dead.*

- Justice Byron White, Tenn. v. Garner, 471 U.S. 1, 11 (1985).

In late January 2023, Detective Trenary, for at least the second time, fired his department-issued weapon at a car moving away from him. On this occasion, Detective Trenary's special unit within the Baltimore County Police Department attempted a vehicle "pinch" maneuver to apprehend Brian McCourry, who was sitting in his car next to a gas pump at a gas station adjoining a busy highway.

As other officers used their vehicles to attempt to pin Mr. McCourry's vehicle between the police vehicles and the concrete pillars surrounding the gas pump, Detective Trenary approached from McCourry's right. Driving an unmarked black SUV in the pre-dawn hours, Detective Trenary, without activating lights or sirens, rammed Mr. McCourry's parked vehicle from the passenger's side, where Mr. McCourry's companion sat. For the next two seconds, Detective Trenary accelerated his SUV into Mr. McCourry's much smaller vehicle, driving it toward the adjacent gas pump. In response, Mr. McCourry fled forward away from the contact.

As Mr. McCourry was maneuvering between another police vehicle and a concrete pillar, Detective Trenary left his vehicle on foot and sprinted from behind Mr. McCourry's vehicle, which was then moving forward, away from all the officers. Detective Trenary raised his weapon and fired a shot through the driver's side window of the fleeing vehicle, striking Mr. McCourry in the neck, instantly paralyzing him. Unable to control the vehicle, it sped into a busy roadway, and struck a civilian vehicle. Mr. McCoury died from his injuries about a month later at a local hospital.

3

Baltimore County, through its chronic failure to protect citizens from excessive force, including its active insulation of Detective Trenary's special unit, the Criminal Apprehension Support Team (CAST), from any measure of accountability, caused Mr. McCourry's death. Even though CAST, by its mission, engages in constant interaction and confrontation with the public—an activity that requires activation of body-worn cameras—the County, through its Chief of Police, adopted a policy of exempting CAST officers from the body-worn camera program all together. The County has further exempted CAST from vehicle-mounted camera and recorded radio communication policies. As a direct result, CAST officers, including Detective Trenary, are free to act without fear of accountability to the public. But for the coincidental placement of private surveillance cameras, there would be no video or photographic evidence of the second (that the public knows about) time Detective Trenary shot a person driving away from him and other officers.

Brian McCourry was unarmed. He did not brandish a weapon or threaten officers or civilians. Evading arrest is wrong, but our society rightfully requires more to justify the use of deadly force, especially when the use of deadly force—here firing at a vehicle driving away into a busy street—endangered many lives.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331, 42 U.S.C. § 1983, 1988; and supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

2.    Venue is proper in this Court under 28 U.S.C. § 1391 because the parties are domiciled in Maryland or organized under Maryland law, and the events took place in

Baltimore County, Maryland.

3.    Plaintiff timely filed notice of its claims under the Local Government Tort Claims Act, § 5-301 *et seq.* of the Courts and Judicial Proceedings Article.

## PARTIES

Plaintiffs

4.    Brian McCourry was, at all times relevant, an adult resident of Maryland.

5.    Mr. McCourry died as a consequence of the acts described herein.

6.    Gina Vancamp is a resident of Baltimore County, Maryland, and is Mr. McCourry's mother and the Personal Representative of his Estate.

7.    Isis Weaver is a resident of Baltimore County, Maryland. Ms. Weaver is the legal guardian of N.W., a minor. N.W. is the natural child of Brian McCourry.

8.    Brian McCourry, Sr. is a resident of Baltimore County, Maryland. Mr. McCourry, Sr. is the father of Brian McCourry.

9.    Shakira Brown-White is a resident of Baltimore County, Maryland. Ms. Brown-White is the legal guardian of B.M., a minor. B.M. is the natural child of Brian McCourry.

10.    Sabrina Tores is a resident of Florida. On information and belief, Ms. Tores was separate from, but still legally married to, Brian McCourry.

11.    Plaintiffs have conducted a good faith and reasonable search to identify and name all individuals who might qualify as use plaintiffs. A copy of the complaint will be served on all use plaintiffs.

Defendants

12.     Defendant Baltimore County, Maryland, is a municipal corporation organized under the provisions of Art. XI-A of the Maryland Constitution. At all times mentioned, Baltimore County employed Detective Trenary.

13.     Defendant Detective J. Trenary, Badge #05232, was, at all times relevant, employed by the Baltimore County Police Department as a Police Officer, and was acting in his individual capacity and/or in his official capacity as a Baltimore County Police Officer, and was acting under the authority and color of state law.

14.     On information and belief, Detective Trenary, along with the other officers present for the events below, were members of BCPD's Criminal Apprehension Support Team, and are collectively referred to as the CAST Officers.

## FACTS COMMON TO ALL COUNTS

January 26th – First Encounter

15.     In early January, BCPD officers requested assistance from the CAST unit in locating and apprehending Mr. McCourry and another person, who were suspects in two non-fatal shooting incidents.

16.     CAST's operational plan was to apprehend Mr. McCourry in his vehicle because he did not spend sufficient time at a residence to obtain a search warrant.

17.     Early in the morning on January 26, 2023, two CAST teams located Mr. McCourry's KIA and began following him in CAST unmarked vehicles but did not attempt an arrest.

18.     Later, Mr. McCourry parked on a street with one way in and one way out. Despite utilizing six total police vehicles, Mr. McCourry was apparently allowed to drive

back out of the dead-end street, past the police cars, and the CAST teams did not attempt an apprehension.

19.    None of the CAST detectives flashed their lights or used their sirens. Instead, they continued to follow Mr. McCourry throughout the morning, but apparently lost sight of Mr. McCourry after he parked in Baltimore City.

20.    The CAST teams abandoned surveillance.

<u>January 31st – The Encounter</u>

21.    The CAST teams located Mr. McCoury's KIA at a motel on Pulaski Highway in White Marsh.

22.    Before they could assemble, Mr. McCourry and the other individual left the motel in the KIA, turned onto Pulaski Highway, then made a U-turn, and pulled into the Royal Farms gas station on the corner of Pulaski Highway and Ebenezer Road.

23.    Mr. McCourry parked at pump #6 at about 6:02 am.

24.    Two minutes later, at 6:04 am, the CAST Officers, using six total unmarked vehicles, pulled into the gas station.

25.    Detective Fischer relayed to the other CAST Officers that Mr. McCourry and the passenger were "looking down" and "not paying attention."

26.    The CAST Officers planned to encircle Mr. McCourry's vehicle in a vehicle block maneuver, "shocking" him with overwhelming resources.



*Figure 1: At 6:07:31 on the surveillance video, six CAST vehicles (blue) encircle Mr. McCourry's KIA (yellow).*

27.     Mr. McCourry was blocked on the driver's (left) side of the KIA by a gas pump, a white square pillar that supports the gas station overhead roof, and another black concrete pillar.

28.     Detective Depew angled his vehicle ("A" in Figure 1) in front of the KIA, with the unoccupied passenger's (right) side of his vehicle closest to the front end of the KIA.

29.     Though Detective Depew apparently intended to park close enough to the KIA to prevent it from escaping, Detective Depew left a gap between his vehicle and the black concrete pillar.

30.     Detectives Wilson and Fischer, each in separate vehicles, approached from the rear. Defendant Detective Trenary ("B" in Figure 1) approached a few seconds later in an unmarked SUV without activating his lights or sirens.

31.     Without any indication that Mr. McCourry, or his passenger, were armed or otherwise threatening the officers, Detective Trenary collided with the passenger's side of

the KIA and, for about two seconds, accelerated, driving the much smaller KIA toward the gas pump and pillar.



*Figure 2: At 6:07:33, Detective Trenary is using his unmarked SUV, without lights or sirens, to forcibly ram Mr. McCourry's vehicle toward the gas pump and concrete pillar.*

32.    Mr. McCourry then drove forward, away from the contact initiated by Detective Trenary. As he attempted to maneuver between Detective Depew's vehicle and the concrete pillar, he made contact with Depew's vehicle and stopped.

33.    Mr. McCourry then apparently shifted into reverse and drifted backwards for about one second, but did not accelerate or collide with any vehicles or the CAST Officers.

34.    Mr. McCourry then proceeded forward, making contact with the passenger's (right) side of Detective Depew's vehicle as he scraped between Depew's vehicle and the black pillar.

35.    Once Mr. McCourry was beyond Depew's vehicle, there were no more CAST Officers or vehicles in his path.

36.    Simultaneously, Detective Trenary left his position of safety behind the forward-moving KIA and chased after Mr. McCourry's vehicle.



*Figure 3: At 6:07:40, Det. Trenary runs out from behind the forward-travelling KIA toward the driver's side.*

37.    As Mr. McCourry proceeded forward, away from the CAST Officers and their vehicles, Detective Trenary raised his department-issued weapon, aimed it at the driver's side window, and fired a single shot.



*Figure 4: At about 6:07:41, Detective Trenary fires a single shot at Mr. McCourry's driver's side window as the KIA drives away from the CAST Officers.*

38.    Neither Detective Trenary, nor any other CAST Officers, were in the KIA's path of travel. None were in danger, much less the kind of imminent danger necessary for

the use of deadly force.

39.     The bullet struck Mr. McCourry in the neck, paralyzing him, causing the KIA to speed into a busy intersection and strike a civilian vehicle.

40.     Even in the heat of the moment, Detective Trenary knew that neither he nor the other Officers was in any imminent danger from the KIA, which was driving away.

41.     In fact, rather than mitigating danger, Detective Trenary created danger by firing toward a busy road at a moving vehicle. If he missed, he placed innocent civilians at substantial danger or death or serious injury. And if he his target—the driver—the vehicle was likely to—and did—speed toward a busy road, also endangering innocent civilians.

42.     Detective Trenary's decision to fire his weapon created a much more dangerous situation than if he and the other CAST Officers simply pursued Mr. McCourry or, like they had the previous week, abandoned the operation for another day.

43.     After approaching the KIA, it took the CAST Officers several minutes to extricate Mr. McCourry because the collision wedged his feet below the pedals and jammed the driver's side door shut.

44.     Paramedics arrived at 6:19 a.m. and transported Mr. McCourry to Johns Hopkins Bayview Hospital.

45.     After a lengthy hospitalization, Mr. McCourry died on March 3, 2023, at the age of thirty-seven, as a result of the gunshot fired by Defendant Trenary.

46.     Baltimore County's Use of Force Policy provides that officers can only discharge their weapon at a moving vehicle when that vehicle is "being used against the officer" and the "safety of innocent persons would not be jeopardized."

47.     At the time Detective Trenary fired his weapon, the vehicle was *not* being used against him or any other officer, and firing at the vehicle caused significant danger to innocent persons.

48.     All the CAST Officers were easily able to maintain a position of safety while Mr. McCourry attempted to escape the scene.

49.     Even if Detective Trenary perceived danger from the initial collision with Detective Depew's car, or when Mr. McCourry briefly drifted in reverse, he did not fire the deadly shot until it was clear that Mr. McCourry was driving away from the CAST Officers, not using his car "against" them.

50.     Detective Trenary and the other CAST Officers could have simply pursued Mr. McCourry. Instead, Detective Trenary used deadly force.

51.     And, but for the fortunate placement of surveillance cameras at the gas station, no video evidence of this tragic encounter would exist. Because, despite Baltimore County's stated goal of equipping all officers with body cameras, not a single officer involved in Mr. McCourry's attempted arrest and shooting was wearing a camera.

52.     It is well-documented that "special" police units, like the Criminal Apprehension Support Team involved in this case, "almost always" lead to "big time problems and quite often tragedies."[1]

_____

[1] In the wake of the Tyre Nichols case, PBS reported on the long history and failures of these units. Kenichi Serino, *Police Special Units Like the One that Killed Tyre Nichols Are Common. Here's Why They've Drawn Criticism*. February 3, 2023.

53.     Over a period of decades, such specialized units have come to power in Detroit, Los Angeles, Memphis, New York City, and even in Baltimore. In each case, the units engaged in rampant violation of constitutional rights and caused hundreds of overturned convictions along with untold civil monetary damages.

54.     With knowledge of that history, Baltimore County empowered the members of the Criminal Apprehension Support Team by equipping them with tactical gear and excluding them from the BCPD's otherwise extensive dashboard and body-worn camera programs.

55.     Baltimore County's Body Worn Camera policy requires that the cameras be activated during pursuits, arrests, field interviews, traffic stops, execution of all warrants, emergency vehicle operations, and any "other activities of a potentially confrontational nature."

56.     By its title and scope, the Criminal Apprehension Support Team, tasked with arresting violent offenders wanted in the county and surrounding areas, is likely to be engaged in these activities more often than almost any other disparate group within BCPD.

57.     Yet, eight years after BCPD began implementing the Body Worn Camera Program, not a single member of the Criminal Apprehension Support Team wears one.

58.     On another recent occasion, Detective Trenary shot another driver after the

_____

https://www.pbs.org/newshour/nation/police-special-units-like-the-one-that-killed-tyre-nichols-are-common-heres-why-theyve-drawn-criticism.

driver allegedly struck Trenary's vehicle during attempted service of a warrant. Again, he was not wearing a body camera or using a dashboard camera.[2]

59.    BCPD has made a conscious choice to let certain units or officers, including the members of the Criminal Apprehension Support Team, operate without fear that video evidence of their unconstitutional conduct will surface after an incident.

## COUNT I
### COMMON LAW BATTERY
### (VS. TRENARY)

60.    The preceding paragraphs are incorporated herein.

61.    Detective Trenary fired his handgun at Mr. McCourry, applying deadly force, without legal justification or excuse.

62.    The bullet fired by Detective Trenary struck Mr. McCourry in the neck.

63.    As a direct and proximate result of Detective Trenary's battery, Mr. McCourry died.

64.    At all relevant times, Detective Trenary was acting in his official capacity as a police officer employed by Baltimore County.

WHEREFORE, Gina Vancamp, as executor of the estate of Brian McCourry, demands judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to

---

[2] *See Rose, et al. v. Baltimore County Maryland, et al.* Case No. 1:23-cv-02078-JRR, currently pending before Hon. Julie Rebecca Rubin.

the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT II
### *42 U.S.C. § 1983 EXCESSIVE FORCE*
### (VS. TRENARY)

65.    The preceding paragraphs are incorporated herein.

66.    At all relevant times, Detective Trenary was a state actor and "person" within the meaning of 42 U.S.C. § 1983 and was acting within the scope of his employment in the Baltimore County Police Department.

67.    Detective Trenary deprived Mr. McCourry of his clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution, namely the right to be free from summary punishment and excessive and unreasonable force.

68.    Detective Trenary, acting with actual or implied malice, deliberately deprived Mr. McCourry of these clearly established rights when he fired into Mr. McCourry's car in the absence of any reasonably perceived danger of imminent death or bodily harm.

69.    Mr. McCourry's right to be free from the use of deadly force is well established and known by all Baltimore County Police Officers, including Detective Trenary.

70.    The Baltimore County Police Field Manual prohibits the use of deadly force except when officers reasonably fear imminent death or serious injury to themselves or innocent bystanders.

71.    Mr. McCourry, although incidentally colliding with an unmarked police

vehicle, was clearly attempting to drive *away* from the CAST Officers, including Detective Trenary.

72.    Faced with a choice between 1) letting Mr. McCourry drive away unharmed and pursuing him in their own vehicles; and 2) firing a kill shot directly at Mr. McCourry's head, Detective Trenary chose the latter.

73.    Each of the CAST Officers, including Detective Trenary, was easily able to maintain a position of physical safety during the encounter.

74.    This is not a mere attempt to substitute hindsight for Detective Trenary's "heat of the moment" judgment.

75.    Allowing Mr. McCourry to drive away posed almost no danger to anyone. Firing directly at his head was certain to cause death or serious injury to the driver, any potential occupants, bystanders, and other officers.

76.    Faced with that choice, Detective Trenary shot to kill, summarily sentencing Mr. McCourry to death for colliding with an unmarked police car and attempting to leave the scene.

77.    A minor hit and run, and even attempting to evade arrest for an outstanding warrant, both without injury, does not justify the use of deadly force.

78.    Detective Trenary acted with deliberate indifference toward Mr. McCourry, and with reckless disregard for Mr. McCourry's constitutionally protected right to be free from summary punishment and excessive and unreasonable force.

79.    Detective Trenary's use of force in seizing Mr. McCourry was objectively unreasonable in light of the circumstances confronting them at the time.

80.    Mr. McCourry died as a direct and proximate result of Detective Trenary's deliberate indifference.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## COUNT III
### *42 U.S.C. § 1983 EXCESSIVE FORCE - MONELL*
### (VS. BALTIMORE COUNTY)

81.    The preceding paragraphs are incorporated herein.

82.    Baltimore County failed to properly train, supervise, and discipline its officers against the use of excessive force, including unjustified deadly force.

83.    The failure to properly train, supervise, and discipline officers demonstrates gross disregard for the constitutional rights of the public, including Mr. McCourry, and was a proximate cause of Mr. McCourry's death.

84.    Baltimore County has also instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights.

Failure to Address Widespread Excessive Force

85.    The use of excessive force occurs so frequently that it has become accepted manner by Defendants and other employees of Baltimore County. This is a result of Baltimore County's failure to establish effective procedures, rules, orders, guidelines, and

practices to ensure that excessive force will not be used and to ensure that allegations of excessive force will be thoroughly investigated and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of excessive force, failure to provide adequate medical care, cover-up, and failure to investigate. This pattern and practice has manifested in other prior incidents involving county officers.

    a. On or about December 19, 2015, Zachary Blumstein became involved in a verbal altercation outside of the Green Turtle Restaurant in Towson, MD. A man who did not identify himself as a police officer grabbed Mr. Blumstein by the arm and pepper sprayed him in the face. Two other officers held Mr. Blumstein down and one of the officers punched him in the face at least once with a closed fist.

    b. On or about August 1, 2016, Baltimore County Police attempted to serve a bench warrant on Korryn Gaines. Ms. Gaines had a shotgun in the home. Six officers gave statements saying that they were not in Ms. Gaines' line of fire and never felt threatened. She was shot by a Baltimore County officer and her son suffered minor physical injuries.

    c. In September 2016, Tawon Boyd, 21 years old, called 911 for assistance during a mental health crisis. Baltimore County police officers responded with the EMTs and, during the attempted restraint, severely beat Mr. Boyd, contributing to his death three days later.

    d. On or about February 9, 2019, Thomas Allotey, his then-girlfriend, and

her three young children, moved into their new home. An unknowing neighbor reported a potential break-in at the residence. Despite all evidence to the contrary, officers forcibly entered the home, physically restrained the adults, then, in front of the children, sprayed pepper spray on Mr. Allotey's face, threw him to the ground, and repeatedly punched him in the head. To conceal their unlawful conduct, the officers referred the victim for serious criminal charges.

e.   On or about March 15, 2019, civilian cell phone video shows Officer Becketts assisting in the arrest of a young male with at least three other officers. As the officers are attempting to place the man under arrest, Officer Becketts can be seen punching the man in the head area at least once and kicking him in the head at least once before another officer pushes him away and tells him to "Back up!"

f.   On or about November 26, 2019, Baltimore County Officers received a call from a mother who was concerned about her son, Eric Sopp. He was suicidal, experiencing a mental health crisis and had left the home after drinking. Officers conducted a traffic stop on the unarmed man and ultimately, he was fatally shot on the side of I-83.

g.   On or about January 29, 2020, Baltimore County officers were dispatched to a residential location following a report of property damage and a possible break-in. The responding officer, Cpl. Brennan's conversation with the woman could be described as antagonistic and the woman ceased

all communication with the officer. The officer followed the woman to her grandmother's house to arrest her for disorderly conduct. He then deployed his mace and taser into the home before saying "You are so f*cked up now! Jesus f*cking Christ!" Officer Schmidt then ran up and immediately tackled the 76-year-old grandmother to the ground.

86.    Baltimore County has failed to keep accurate records as to the number of false arrests by members of its police force. This policy encourages arrests without probable cause and inhibits Baltimore County from critically evaluating the need for a change in training.

87.    Baltimore County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of excessive force by officers who have a pattern or history of such behavior.

88.    As a direct and proximate result of Baltimore County's permissive, if not encouraging, policy toward the use of unreasonable and excessive force, Mr. McCourry was deprived of his Fourth and Fourteenth Amendment rights when he was summarily shot by Detective Trenary.

Body Worn Camera Program

89.    Baltimore County has also empowered its officers, specifically the Individual Defendants and others in special units, including the Criminal Apprehension Support Team, to freely violate the constitutionally protected rights of citizens by failing to equip them with body cameras.

90.    Specifically, after Gaines and Boyd incidents in 2016, *supra*, then Baltimore

County Executive Kevin Kamenetz and BCPD stated their intent to equip BCPD officers with body worn cameras by September 2017, fourteen months earlier than previously planned.

91.    According to Mr. Kamenetz, body worn cameras "make our community and our officers safer."[3]

92.    Despite Baltimore County's stated goal of equipping all officers with body cameras, not a single officer involved in Mr. McCourry's shooting was wearing a camera.

93.    In August 2022, Baltimore County Police estimated that 350 sworn officers still lacked body worn cameras.

94.    After Defendant Trenary shot another civilian in 2022, again without a body worn camera or a dashboard camera on his vehicle, Baltimore County Police estimated that there were still 350 sworn officers without body worn cameras.

95.    At all times, the Chief of Police for Baltimore County, Melissa Hyatt from 2019 to November 2022, and Dennis Delp (interim) from November 2022 to April 2023, had complete discretion over which officers or units were incorporated into the BCPD body worn camera program.

96.    Baltimore County, through its Chief of Police, established a policy that

---

[3] Ethan McLoud, *Balt. Co. Police to Speed Up Body Cam Rollout, Improve Sex Assault Response and Training Policies*, BALTIMORE FISHBOWL (Oct. 19, 2016), https://baltimorefishbowl.com/stories/balt-co-police-speed-body-cam-rollout-improve-sex-assault-response-training-policies/.

certain officers, including Detective Trenary and CAST, would be excluded from the body worn camera program even though they engage in a disproportionate amount of police activity that otherwise requires activation of a body worn camera.

97.    By creating a "special unit" like the Criminal Apprehension Support Team, with actual knowledge that these units are more likely to commit serious violations of the constitutional rights of civilians, and reducing officer accountability through an official policy of excluding these officers from the body worn camera program, Baltimore County made it reasonably likely that injuries such as those inflicted upon Mr. McCourry would occur regularly.

98.    This intentional failure to ensure even a marginal level of accountability is evidence that Baltimore County intended for special units like the Criminal Apprehension Support Team to act with impunity and, as a direct and proximate result of the County's deliberate indifference, Mr. McCourry was deprived of his Fourth and Fourteenth Amendment rights when he was summarily shot by Detective Trenary.

<u>Failure to Train</u>

99.    Further, the failure to train Baltimore County Officers in the appropriate use of deadly force is so patently obvious from the conduct of Detective Trenary that constitutional violations would be the expected result.

100.    Despite the confrontational nature of the CAST mission, and the failure to use any kind of body-worn or vehicle cameras, CAST does not have a formal policy manual or participate in formal training as it relates to any aspect of their assignment.

101.    In interviews with investigators, the CAST officers said that training within

the unit is "informal."

102.    Given that CAST team members are required to make use of force decisions substantially more often than other officers and are asked to execute tactical maneuvers like in this case, failing to require formal training amounts to deliberate indifference by the County.

103.    Detective Trenary's supervising Sergeant told investigators that, if a vehicle maneuvers out of the "pinch" like was tried here, "common practice" (but not training) required them to bail out or withdraw.

104.    Detective Trenary did not bail out. He ran after Mr. McCourry and shot at the moving vehicle, endangering many people in the process. And this was the second time in one year that Detective Trenary fired at a moving vehicle that was traveling away from CAST Officers.

105.    The County's failure to require specific training for the officers that are required to make use of force, including deadly force, decisions most often, especially in light of prior incidents, made it reasonably foreseeable that the CAST Officers would regularly deprive citizens of their constitutionally protected rights, including to be free from summary punishment and excessive force.

106.    CAST Officers told investigators that they perform 10-15 vehicle blocks like the one in this case each month, and they apparently review each operation after the fact.

107.    Given the prevalence of this maneuver, it was a near certainty that CAST Officers would encounter situations where suspects or other targets of the maneuver would escape.

108.    Had the County required specific training on the use of deadly force against a fleeing vehicle, including after the last time Detective Trenary shot a fleeing suspect, Mr. McCourry would be alive today.

109.    The County's deliberate failure is more egregious after Detective Trenary, less than one year before fatally shooting Mr. McCourry, shot Shane Radomski during CAST's attempted arrest of a third person.

110.    During that incident, CAST attempted a similar vehicle block maneuver in a parking lot with multiple cars. Detective Trenary arrived several seconds after the rest of the team and, even though the target of the operation was on foot and compliant, Detective Trenary collided with a bystander vehicle trying to flee the chaotic scene.

111.    When the unknown driver continued to try to flee, Detective Trenary pursued on foot, leaving a position of safety, and firing at the moving vehicle.

112.    Unlike here, his fellow officers responded by opening fire, and the unknown civilian was struck at least ten times, causing severe and permanent injuries.

113.    Even after this shooting in April 2022, when Baltimore County knew that CAST officers, including Detective Trenary, had opened fire on a moving vehicle driven by an unknown civilian during a vehicle block maneuver, the County failed to implement formal training for CAST officers on the use of force during these tactical maneuvers.

114.    As a direct and proximate result of Baltimore County's permissive, if not encouraging, policy toward the use of unreasonable and excessive force, and its failure to train its officers despite actual knowledge that it would cause constitutional injuries.  Mr. McCourry was deprived of his Fourth and Fourteenth Amendment rights when he was

summarily shot by Detective Trenary.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

### COUNT IV
#### *ARTICLE 24 & 26 MARYLAND DECLARATION OF RIGHTS – EXCESSIVE FORCE*
#### (VS. ALL DEFENDANTS)

115. The preceding paragraphs are incorporated herein.

116. At all relevant times, Detective Trenary acted under color of the laws of the State of Maryland.

117. The Detective Trenary used objectively unreasonable, unnecessary, and excessive force against Mr. McCourry, thereby injuring and killing him, and violating his right to be free from excessive force, as protected by Articles 24 and 26 of the Maryland Declaration of Rights.

118. No force, especially not deadly force, was justified based on the circumstances confronting Detective Trenary at the time.

119. Detective Trenary acted deliberately, without provocation or legal justification, and with intent to violate Mr. McCourry's rights under Articles 24 and 26 of the Maryland Declaration of Rights.

120. As a direct and proximate result of the Detective Trenary's deliberately indifferent conduct, Mr. McCourry died.

121.    In the foregoing acts, Detective Trenary was acting within the scope of his employment with Baltimore County.

122.    Baltimore County is vicariously liable for the Individual Defendants' violations of Mr. McCourry's rights under Articles 24 and 26 of the Maryland Declaration of Rights

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

**COUNT V**
***ARTICLE 24 & 26 MARYLAND DECLARATION OF RIGHTS – EXCESSIVE FORCE (LONGTIN CLAIM)***
**(VS. BALTIMORE COUNTY)**

123.    The preceding paragraphs are incorporated herein.

124.    Baltimore County failed to properly train, supervise, and discipline its officers against the use of excessive force, including unjustified deadly force.

125.    The failure to properly train, supervise, and discipline officers demonstrates gross disregard for the constitutional rights of the public, including Mr. McCourry, and was a proximate cause of Mr. McCourry's death.

126.    Baltimore County has also instituted and maintained formal and informal customs, policies, and practices that foster, promote, and encourage officers to use excessive force and otherwise violate citizens' constitutional rights.

127.    The use of excessive force occurs so frequently that it has become accepted by Baltimore County. This is a result of Baltimore County's failure to establish effective procedures, rules, orders, guidelines, and practices to ensure that excessive force will not be used, allegations of excessive force will be thoroughly investigated, and appropriately punished when found to have occurred. As a result of this failure, there has been a regular pattern and practice of excessive force, failure to provide adequate medical care, cover-up, and failure to investigate. This pattern and practice has manifested in other prior incidents involving County officers, as set forth in Plaintiffs' *Monell* Count.

128.    Baltimore County lacks an effective internal affairs procedure and has no meaningful system to control and monitor the recurrence of excessive force by officers who have a pattern or history of such behavior.

129.    As previously stated, Baltimore County's failure to implement a body worn camera program for a "special unit" like the Criminal Apprehension Support Team, despite knowledge that these units have historically resulted in gross violations of civilians' constitutional rights, and its failure to adequately discipline officers for these incidents or report them for independent investigations, has created a custom or policy of tolerance for excessive force against civilians.

130.    Baltimore County's failure to properly train, prosecute, supervise, and discipline its officers, as set forth above, is so patently obvious from the conduct of the Detective Trenary that constitutional violations would be the expected result.

131.    Baltimore County caused its officers and other employees to believe that their use of excessive force would not be aggressively, honestly, and properly investigated.

132.   Baltimore County should have foreseen that such a policy would promote the use of illegal, unconstitutional, and excessive force, where such force is objectively unreasonable.

133.   The execution of the unconstitutional policies or customs of Baltimore County was the cause of Mr. McCourry's death.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

### COUNT VI
### *COMMON LAW GROSS NEGLIGENCE*
### (VS. TRENARY)

134.   The preceding paragraphs are incorporated herein.

135.   Detective Trenary owed a duty to Mr. McCourry to refrain from the use of deadly force absent reasonable belief that the officers present, or innocent bystanders, were in imminent danger of severe injuries.

136.   Detective Trenary breached this duty when he fired into Mr. McCourry's vehicle in the absence of any real danger to the officers or anyone else.

137.   Mr. McCourry attempted to flee a panic-inducing scene in which plain clothed officers in tactical gear rushed toward his car in non-descript vehicles without police lights.

138.   Mr. McCourry reasonably panicked and tried to exit via clear paths of egress,

and never intentionally drove at, or otherwise posed any danger to the officers.

139.    Rather than take normal steps to pursue and/or detain Mr. McCourry and his passenger for attempting to flee the scene, Detective Trenary indiscriminately opened fire into the car.

140.    Detective Trenary acted recklessly with gross negligence and/or malice when he breached his duty to Mr. McCourry, shooting him in the neck and causing his death.

141.    Even if Detective Trenary perceived some danger from Mr. McCourry's attempt to flee the scene, he had a duty to mitigate the danger to everyone at the scene.

142.    Rather than attempt to avoid danger, Detective Trenary intentionally and recklessly escalated the situation.

143.    Detective Trenary demonstrated ill-will, evil intent, and wrongful motive toward Mr. McCourry when he made the deliberate decision to discharge his weapon at Mr. McCourry's car in a manner certain to maim or kill Mr. McCourry.

144.    Mr. McCourry died as a direct and proximate result of Detective Trenary's gross negligence.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

### COUNT VII
### *WRONGFUL DEATH*
### ALL DEFENDANTS

145.   All preceding paragraphs are incorporated herein.

146.   The acts and omissions herein caused the death of Brian McCourry.

147.   Gina Vancamp and Brian McCourry, Sr. are the natural parents of Brian McCourry.

148.   N.M. is the natural child of Brian McCourry.

149.   On information and belief, B.M., and Sabrina Tores are also wrongful death plaintiffs under Maryland law. Plaintiffs will serve a copy of the Complaint and use-plaintiff notice on each.

150.   As a direct result of the acts and omissions herein, Gina Vancamp, Brian McCourry, Sr., and N.W. have suffered damages, including loss of economic support, loss of society and affection, and other emotional distress.

WHEREFORE, Gina Vancamp, Brian McCourry, Sr., and N.W. demand judgment against Defendants, jointly and severally, as follows: (1) compensatory damages in excess of $75,000, exclusive of interest and costs; (2) reasonable attorneys' fees and costs, as permitted; (3) pre- and post-judgment interest; (4) punitive damages to the fullest extent permitted by law; and (5) any other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial.

Dated: October 24, 2024                         Respectfully Submitted,

                                                /s/ *Nicholas Bonadio*

                                                Nicholas C. Bonadio (# 13679)

nbonadio@kblitigation.com
Thomas W. Keilty, III (#18992)
tkeilty@kblitigation.com
Keilty Bonadio, LLC
One South Street – Suite 2125
Baltimore, Maryland 21202
410-469-9953

Jay D. Miller (Bar No. 04653)
Angelos Law, P.C.
Jmiller@lawpga.com
One Charles Center
100 N. Charles St. 20th Floor
Baltimore, Maryland 21201
Tel: (410) 649-2000
Fax: (410) 649-2151

Raphael J. Santini (Bar No. 05128)
crimadmin@santinilegal.com
RAPHAEL J. SANTINI, P.A.
9736 Harford Road
Baltimore, Maryland 21234
Tel: (410) 665-9433
Fax: (410) 665-8439

*Counsel for Plaintiffs*