## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GINA VANCAMP ET AL.,                    *

     Plaintiffs,                         *

v.                                      *

                                      Civil No. 24-3097-BAH

BALTIMORE COUNTY,                       *
MARYLAND ET AL.,
                                        *
     Defendants.
                                        *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## <u>MEMORANDUM OPINION</u>

Gina Vancamp, Individually and as Personal Representative of the Estate of Brian McCourry, Isis Weaver, as next friend of N.W., a minor child, Brian R. McCourry, Sr., Sabrina McCourry, and Shakira White, as next friend of B.M., a minor child (collectively "Plaintiffs") brought suit against Baltimore County and Detective J. Trenary (collectively "Defendants") alleging battery (Count I against Trenary), excessive force under 42 U.S.C. § 1983 (Count II against Trenary), excessive force under 42 U.S.C. § 1983 under a theory of *Monell* liability[1] (Count III against Baltimore County), excessive force under Article 24 and Article 26 of the Maryland Declaration of Rights (Count IV against all Defendants), excessive force under Article 24 and Article 26 of the Maryland Declaration of Rights under a theory of *Longtin* liability[2] (Count V against Baltimore County), gross negligence (Count VI against Trenary), and wrongful death (Count VII against all Defendants). ECF 1 (complaint). Pending before the Court is Defendants'

---

[1] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

[2] *Prince George's Cnty. v. Longtin*, 19 A.3d 859 (Md. 2011).

Motion for Summary Judgment (the "Motion"). ECF 15. Plaintiffs filed an opposition[3], ECF 21, and Defendants filed a reply, ECF 25. The Motion includes two exhibits.[4] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, Defendants' Motion is **DENIED.**

## I.    BACKGROUND

This case stems from the death of Brian McCourry due to injuries sustained when he was shot by police on January 31, 2023 as he attempted to flee an arrest in his car. ECF 1, at 3. That evening, a specialized police unit called the Criminal Apprehension Support Team (CAST) followed McCourry and a passenger to a Royal Farms gas station.[5] ECF 21, at 10; Ex. B. Video footage of the incident shows six unmarked police vehicles, not all of which utilized flashing lights, simultaneously pulling around McCourry's vehicle to block him in. Ex B, 6:40–49. Trenary

---

[3] Brian McCourry, Sr., Shakira White, Gina Vancamp, and Isis Weaver filed a response in opposition to the Motion. ECF 21. Sabrina Tores filed a separate response in opposition to the Motion, but "adopt[ed] the arguments and exhibits set forth" in ECF 21. *See* ECF 22, at 1.

[4] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page, except for Exhibit B. Exhibit B is a CD containing video footage of the incident at the heart of this case. The Court granted Defendants' motion for leave to file a physical exhibit, ECF 17, and will cite the video footage as "Ex. B, time stamp."

[5] Defendants maintain that at the time he was shot, McCourry "had an outstanding warrant and was wanted for attempted first-degree murder and other violent crimes." ECF 15-1; at 2 (citing an arrest warrant for various crimes including attempted murder and assault found at ECF 15-2, at 2). Plaintiffs respond that "Defendants' Exhibit 2 purports to be an arrest warrant for [] McCourry on charges including attempted first-degree murder," but "[t]his document was signed on February 1, 2023, a month after the incident, and [is] therefore irrelevant." ECF 21, at 20 n.7. The warrant provided by Defendants appears to have been signed by the commissioner on February 1, 2023 at 2:05 in the afternoon. ECF 15-2, at 2. The video footage of the incident, also provided by Defendants, is dated January 31, 2023, and Plaintiffs state in their brief that the incident took place on January 31, 2023, one day before the signing of the warrant. *See* ECF 21, at 10. Thus, Plaintiffs' assertion that the arrest warrant was signed a *month* after the incident appears to be an error. However, Plaintiffs' underlying objection to the relevance of the arrest warrant retains merit nonetheless. At this stage, the arrest warrant cannot establish, by itself, that the officers knew McCourry was wanted for the above-referenced charges given that it was apparently signed on the day following the incident in question.

approached McCourry's vehicle, a Kia, from the right side and used his vehicle to run into the right side of the Kia, pushing it toward the gas pump. *Id.* 6:48–50. McCourry then accelerated forward and ran into the side of another unmarked vehicle. *Id.* 6:50–53. He then slowly reversed the car a few inches. *Id.* 6:53–56. It appears at least two officers were running toward or were already behind the Kia as McCourry reversed. *Id.* McCourry then accelerated forward, again swiping the side of the unmarked police car he had previously hit. *Id.* 6:56–59. As McCourry was driving away from the gas station, an officer ran after the Kia with his gun pointed. *Id.* 6:59–7:01. All of the remaining officers then run off screen. *Id.* 7:02–15. The video does not contain audio.

It is not clear to the Court, after reviewing the video footage, when exactly the gun that fired the fatal shot was discharged. However, it appears undisputed that Trenary fired a shot at the driver's side window of McCourry's vehicle after McCourry drove forward the second time. *See* ECF 15-1, at 3; ECF 21, at 11. It is also undisputed that Trenary shot McCourry in the neck, which "caus[ed] the K[ia] to career into a busy intersection and strike a civilian vehicle." ECF 21, at 12; ECF 15-1, at 3. McCourry died in March of 2023 as a result of the gunshot wound. ECF 21, at 12; ECF 15-1, at 3.

Plaintiffs filed suit in October 2024 against Baltimore County and Trenary alleging excessive force in violation of the Fourth Amendment and the Maryland Declaration of Rights, and various state law claims. Defendants moved for summary judgment before discovery commenced. Construing the facts in the light most favorable to Plaintiffs, as the Court is required to do at this stage of the proceedings, disputes of material fact preclude an award of summary judgment.

## II.   **LEGAL STANDARD**

### A.   **Rule 56(a)**

3

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists." *Progressive Am. Ins. Co. v. Jireh House, Inc.*, 608 F. Supp. 3d 369, 373 (E.D. Va. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986)). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . " *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (per curiam); *Scott v. Harris*, 550 U.S. 372, 378 (2007), and the Court "may not make credibility determinations or weigh the evidence," *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 213 (4th Cir. 2007)). For this reason, summary judgment ordinarily is inappropriate when there is conflicting evidence because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black &*

*Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 2003)). "The existence of a mere scintilla of evidence in support of the nonmoving party as well as conclusory allegations or denials, without more, are insufficient to withstand a summary judgment motion." *Progressive Am. Ins. Co.*, 608 F. Supp. 3d at 373 (citing *Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020)).

### B.    Rule 56(d)

"Rule 56(d) requires that summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition. The rule is intended as a safeguard against a premature grant of summary judgment." *Tyree v. United States*, 642 F. App'x. 228, 230 (4th Cir. 2016) (internal citations omitted). Specifically, Rule 56(d) provides that "[i]f a movant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . defer considering the motion or deny it[.]" Fed. R. Civ. P. 56(d). Rule 56(d) motions are "broadly favored and should be liberally granted." *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483–84 (4th Cir. 2014) (quoting *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013)). "A court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant. But a court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Pisano v. Stranch*,

743 F.3d 927, 931 (4th Cir. 2014) (citing *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)).

To succeed on a request to defer summary judgment until the completion of discovery, the nonmoving party must submit a Rule 56(d) affidavit demonstrating why it cannot yet properly oppose a motion for summary judgment. *Pine Ridge Coal v. Local 8377*, 187 F.3d 415, 421 (4th Cir. 1999). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protections of Rule 56[(d)] in good faith and to afford the trial court with the showing necessary to assess the merit of a party's opposition." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (citing *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988)). "A [Rule 56(d)] affidavit that conclusorily states that discovery is required is insufficient; the affidavit must specify the reasons the party is unable to present the necessary facts and describe with particularity the evidence that the party seeks to obtain." *Radi v. Sebelius*, 434 F. App'x. 177, 178 (4th Cir. 2011). If the nonmovant is able to identify specific reasons why it cannot present facts essential to support its opposition in its Rule 56(d) affidavit, "the court may: (1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

## III. **ANALYSIS**

### A. **The Motion is Premature.**

The Court again notes that discovery has not yet taken place in this case.[6] In the response in opposition to summary judgment, Plaintiffs attached a Rule 56(d) affidavit requesting discovery. *See* ECF 21-1. Plaintiffs argue that because they have not yet been afforded an opportunity to

---

[6] Defendants have not filed a response to the complaint outside of the instant motion, and the Court has not yet entered a discovery order or scheduling order.

6

conduct discovery, they are "in the proverbial fencing match without a mask or sword." ECF 21,

at 7. Defendants argue that there is no genuine dispute of fact in the case, without explicitly

addressing Plaintiffs' request for discovery. *See* ECF 25, at 3–4. For the reasons that follow, the

Court finds that Plaintiffs have sufficiently shown they are entitled to conduct discovery to support

their opposition to summary judgment.

A party may move for summary judgment before the commencement of discovery. *See*

Fed. R. Civ. P. 56(b). However, "[s]ummary judgment before discovery forces the non-moving

party into a fencing match without a sword or mask." *McCray*, 741 F.3d at 483. "Consequently,

summary judgment [must] be denied when the nonmovant has not had the opportunity to discover

information that is essential to his opposition." *Callender v. Callender*, Civ. No. TDC-15-4015,

2016 WL 3647613, at *6 (D. Md. June 30, 2016) (citation and internal quotation marks omitted).

To satisfy Rule 56(d)'s mandates and obtain additional discovery, the nonmoving party "must

specifically allege why the information sought would [be] sufficient to create a genuine issue of

material fact such that it would [] defeat[] summary judgment." *Strag v. Bd. of Trustees, Craven

Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995).

Based on the Rule 56(d) affidavit attached to the opposition to summary judgment, the

Court is convinced that Plaintiffs' request for discovery is appropriate. Plaintiffs note that

"[a]lthough [] McCourry died as a result of the shooting, there was a passenger in his vehicle at

the time of the encounter. There were also numerous civilian witnesses and non-Defendant police

officers present." ECF 21-1, at 2 ¶ 7. According to Plaintiffs, "[d]iscovery as to the accounts of

these witnesses is required to show, among other things:

> a. Records related to the pre-incident surveillance of Mr. McCourry,
> including whether officers had opportunities to apprehend Mr.
> McCourry without creating a dangerous situation at a busy gas station;

    b.  Whether any of the police officers activated emergency sirens and, if they did, whether Mr. McCourry could have reasonably perceived the sirens (the surveillance footage from the Royal Farms gas station does not have sound);

    c.  Whether any of the police officers issued any verbal commands to Mr. McCourry and, if they did, whether Mr. McCourry could have reasonably perceived the commands (the surveillance footage from the Royal Farms gas station does not have sound);

    d.  As all of the police vehicles were unmarked and with dark tinted windows, and the officers were all wearing tactical clothing, whether Mr. McCourry perceived that the vehicles were, in fact, police vehicles;

    e.  Whether Mr. McCourry reasonably perceived that he was under arrest;

    f.  What information the officers, including Det. Trenary, knew about Mr. McCourry prior to, and during the encounter. For example, Defendants rely on Exhibit A, ECF 15-2, an arrest warrant, for the officers' basis of knowledge about Mr. McCourry's alleged crimes, but that warrant was executed more than a month after the events of this case; and

    g.  Whether any individuals were in the direct path of Mr. McCourry's vehicle when Det. Trenary fired his weapon."

*Id.* at 2–3 ¶ 8. These discovery requests directly address the ultimate issue of the reasonableness of the force. Defendants argue that "[w]hat McCourry knew has no bearing on the objective reasonableness of [] Trenary's acts." ECF 25, at 3. But this argument ignores well-established precedent. *See Betton v. Belue*, 942 F.3d 184, 193 (4th Cir. 2019) (explaining that if the court were to "ignore the officers' failure to identify themselves or to give any verbal commands, we would be discounting the analysis in *Cooper* [*v. Sheehan*] and other prior decisions in which we found such facts critical in determining whether excessive force was used"). Plaintiffs have plausibly argued that discovery may reveal facts that could show that Trenary's use of deadly force was unreasonable. This is not an instance when "the evidence sought [is] almost certainly nonexistent or [is] the object of pure speculation." *See Ingle*, 439 F.3d at 196 (citation omitted).

A recent decision by the U.S. Court of Appeals for the Fourth Circuit confirms that, particularly in cases involving the use of deadly force, discovery is required when "the record presents a potential material dispute of fact." *Boyle v. Azzari*, 107 F.4th 298, 302 (4th Cir. 2024). In *Boyle*, the Fourth Circuit reversed the pre-discovery award of summary judgment in a § 1983 case in which a police officer shot and killed a man holding a replica firearm and a knife approximately "fifteen to twenty-five feet away" from the officer. *Id.* at 300. The Fourth Circuit found that the district court erred in granting summary judgment because the plaintiff "explicitly informed the court of the importance of discovery to her case" and sought access to specific discovery, namely an autopsy report and an opportunity to depose defendant about what occurred. *Id.* at 302. In reversing the district court, the Fourth Circuit held that "[t]he district court was [] well aware of the insufficiency of the summary judgment record and should have allowed time for discovery before assessing [defendant's] motion." *Id.* Critical to the dispute at bar, the appellate court also explained that "special difficulties can arise during summary judgment in use of deadly force cases where a defendant has killed a key witness who can refute the defendant's account." *Id.* (citations and internal quotation marks omitted). Given Plaintiffs' clear articulation of the importance of discovery in this case, which centers on the reasonableness of the use of deadly force, *Boyle* counsels that summary judgment would be inappropriate at this time.[7]

It also bears noting that the Fourth Circuit found pre-discovery summary judgment inappropriate in *Boyle* "because the record present[ed] a potential material dispute of fact." *Boyle*, 107 F.4th at 302. Of note were conflicting accounts "of the moments immediately preceding the

---

[7] Moreover, just four months ago, the Fourth Circuit again reiterated, in vacating a district court's grant of summary judgment pre-discovery, that Rule 56(d) is broadly favored in this Circuit. *See Farabee v. Gardella*, 131 F.4th 185, 193 (4th Cir. 2025) ("[T]his Court has cautioned that district courts should not consider summary judgment motions where the nonmoving party has not had an opportunity to discover information essential to its opposition.").

use of force, the core issue in every excessive force case[.]" *Id.* The Fourth Circuit reiterated that "[w]hen faced with a Fourth Amendment claim involving the use of deadly force, 'the question comes down to whether the circumstances presented an immediate threat that justified the officer's resort to lethal force as objectively reasonable.'" *Id.* at 303 (quoting *Franklin v. City of Charlotte*, 64 F.4th 519, 530 (4th Cir. 2023)). As noted above, the video of the incident—the only indisputably relevant piece of evidence currently before the Court—reflects that McCourry may have been driving *away* from officers when he was shot, thus discovery may "provide additional color regarding whether that use of force was reasonable given [Trenary's] training and the circumstances." *Id.* (citing *Hupp v. Cook*, 931 F.3d 307, 323 (4th Cir. 2019)). Indeed, the record before the Court at this time reflects disputes of material fact in several key areas, which the Court addresses below.

### 1. Reasonableness of Force

The following claims hinge, at least in some respect, on the reasonableness of the use of deadly force: battery (Count I), excessive force pursuant to Section 1983 (Count II), excessive force under Articles 24 and 26 of the Maryland Declaration of Rights (Count IV), gross negligence (Count VI), and wrongful death (Count VII). Defendants urge this Court to find, based solely on the video footage, that "Trenary's use of force was objectively reasonable considering the danger McCourry presented to law enforcement and the public." ECF 25, at 4. Plaintiffs respond that Defendants' argument "turns on disputed facts . . . specifically whether the information available to Det. Trenary at the moment—and immediately before—he used deadly force gave him probable cause to believe that [] McCourry posed an *imminent* threat of severe injury to the officers or others." ECF 21, at 7 (emphasis in original).

In assessing the reasonableness of force, a court should consider: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989). It is important to recognize that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Nevertheless, a police officer may employ deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* at 11.

In *Scott v. Harris*, which also involved a Fourth Amendment excessive force claim, the Supreme Court evaluated a taped recording of the incident in question. 550 U.S. at 375–76. The Court found that "[r]espondent's version of events [was] so utterly discredited by the record that no reasonable jury could have believed him," and therefore, "[t]he Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Id.* at 380–81. However, as the Fourth Circuit explained in *Harris v. Pittman*, "[s]ummary judgment is proper under *Scott* only when there is evidence . . . of undisputed authenticity that shows some material element of the plaintiff's account to be 'blatantly and demonstrably false.'" 927 F.3d 266, 275 (4th Cir. 2019) (quoting *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007)).

Here, while Defendants advance an argument that McCourry was using his vehicle as a weapon and placing the officers in immediate danger, ECF 25, at 4, the video evidence does not conclusively support this theory such that Defendants are entitled to judgment as a matter of law. Rather, as Plaintiffs suggest, this is a "subjective interpretation[] of the limited video evidence available," ECF 21, at 9, given that the video reflects that McCourry reversed slowly, and only a

11

for a few inches, before changing course and driving in a direction where, at least as shown on the video footage, there were no officers or bystanders.[8] Ex. B, 6:50–58. According to Plaintiffs, "Trenary applied such force with his SUV that it pushed [] McCourry's smaller vehicle sideways toward the gas pump," and "[a] reasonable juror could conclude that [] McCourry was merely attempting to flee a dangerous situation created by [] Trenary, and that it was therefore unreasonable for [] Trenary to interpret [] McCourry's attempt to flee, alone, as an imminent threat justifying the use of deadly force." ECF 21, at 19. Because the video evidence does not render Plaintiffs' account a "visible fiction," but rather confirms that the evidence lends itself to multiple interpretations, the Court declines to award summary judgment before discovery. *See Harris*, 927 F.3d at 276 (explaining that at summary judgment, the court's obligation to construe the facts in the light most favorable to the non-moving party "continues to apply in the face of documentary evidence that lends support to a government official's account of events, or even makes it unlikely that the plaintiff's account is true" (citation and quotation marks omitted)).

Along those same lines, there is a genuine dispute of material fact over whether the justification for the force had been eliminated by the time Trenary fired his weapon. Plaintiffs allege that "no officer or other person was in the trajectory of [] McCourry's vehicle when []

---

[8] As described below, the Court disregards Defendants' argument that McCourry posed a threat to officers and the public because he "was speeding in the trajectory of a 'busy road' occupied by innocent drivers." ECF 25, at 5 (quoting ECF 1, at 11 ¶ 41). The footage provided to the Court does not reflect that people (or vehicles) were in McCourry's way as his car accelerated out of the parking lot and Trenary apparently fired at him. Ex B, 6:57–7:00. Any argument that McCourry endangered the public must be supported by record evidence, and this Court is "required to construe the record evidence favorably to [Plaintiffs]," despite any views on whether they will "ultimately [] prevail at trial." *Harris*, 927 F.3d at 272. Because the only evidence submitted was the video footage and the disputed arrest warrant, there is no basis in the record at this time for Defendants' implied assertion that deadly force was necessary to protect officers and bystanders who may have been struck by McCourry after he had successfully evaded the officers' attempt to pin his vehicle in and was accelerating out of the parking lot.

12

Trenary used deadly force. ECF 21, at 27 (citing ECF 1 at ¶¶ 35, 40). Defendants counter that deadly force was necessary because "McCourry struck an officer's vehicle, *then* reversed his vehicle in the direction of Sgt. Bakhsh and *then* struck a police vehicle again," ECF 25, at 4 (emphasis in original), perhaps implying that there was a reasonable fear that McCourry would again reverse his vehicle in the direction of the officers despite having apparently escaped their attempts to pin him in. Regardless, the video indisputably shows Trenary running after McCourry's vehicle with his gun drawn after McCourry maneuvered his car out of the enclosure created by the six police cars. *See* Ex. B, 6:57–7:00. Moreover, because there is no sound, it is not clear from the video footage when the gun was actually fired,[9] or whether McCourry paused his acceleration[10] in a manner that might suggest an intention to again reverse in the direction of the officers. Therefore, the Court is "left with a soundless video containing mere images," and "[i]t is difficult to decipher from reviewing the video the true sequence of events." *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 277 (4th Cir. 2011).

---

[9] Defendants indicate that "Trenary fired a single shot into the driver's side window of McCourry's Vehicle," and cite 6:59 of the video footage for that assertion. *See* ECF 15-1, at 3. At this point in the video, McCourry is driving out of the gas station and the video does not reflect that anyone is in the immediate trajectory of his vehicle as he accelerates forward. Ex. B, 6:59–7:00.

[10] The Court notes that Defendants do not appear to endorse the unlikely scenario that McCourry intended to again reverse toward the officers after successfully escaping their barricade given that the video reflects McCourry's persistent efforts to flee arrest. However, Defendants do argue that McCourry's earlier decision to reverse his car in the direction of officers, albeit slowly and only for a short distance, is critical to evaluating the reasonableness of Trenary's subsequent decision to use deadly force. *See* ECF 15-1, at 6–7 ("Despite the CAST officers' efforts to quickly block McCourry's vehicle using six police vehicles . . . McCourry did not yield. Instead, he attempted to evade arrest by driving his car into Detective Depew's vehicle (while Det. Depew was near it), reversing back towards Sgt. Bakhsh, and striking Detective Depew's vehicle again. [McCourry's] unlawful actions were made without regard to human life and presented an immediate threat to the safety of not only the officers involved, particularly Depew and Baksh, but also any member of the public frequenting the gas station that morning.").

The Court cannot decide on this bare record whether the use of deadly force was warranted when the video reflects that no one was in the trajectory of McCourry's vehicle as he drove off. Defendants argue that McCourry "created an immediate threat to officers and the public" by "driving into [a Detective's] vehicle, reversing in the direction of [another officer], and then striking [the Detective's] vehicle again." ECF 15-1, at 6. Plaintiffs respond that "it is objectively reasonable to expect [] Trenary to know that using his vehicle, unmarked and without emergency lights or sirens, as a battering ram before [] McCourry had been given any verbal commands, was likely to cause [] McCourry to panic and flee," and that McCourry's reaction alone did not justify the use of deadly force. ECF 21, at 18. The video evidence does not unambiguously show that when he was shot, McCourry was attempting to run officers over or otherwise place them, or the public, in immediate danger. Thus, discovery is necessary to determine additional facts about the circumstances giving rise to the fatal shooting, as these facts are not indisputably discernable from the silent video clip provided by Defendants. Of course, additional discovery may shed more light on the events of that evening such that Trenary's decision can best be described as reasonable. *See Barnes v. Felix*, 145 S. Ct. 1353, 1356 (2025) (rejecting "moment-of-threat" rule and holding that "[t]o assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment"). However, on the thin record presently before it, the Court cannot conclude that it was, as a matter of law, reasonable for Trenary to utilize deadly force as McCourry sped out of the parking lot away from officers.

Indeed, another judge of this district recently reached the same conclusion after examining similar facts in which another man was shot by Trenary while he was attempting "to flee in his vehicle by heading toward an open pathway in [a parking] lot." *Rose v. Baltimore Cnty., Md.*, Civ.

14

No. 23-02078-JRR, 2024 WL 3924595, at *1 (D. Md. Aug. 23, 2024). Judge Rubin denied a motion for judgment on the pleadings, holding that the plaintiff's "allegations that he was shot while no officer or other person was in the trajectory of his vehicle plausibly alleges a violation of his Fourth Amendment right" to be free from seizure by means of excessive force.[11] *Id.* at *7. While the motion in the case at bar is one for summary judgment, the same principle applied by Judge Rubin holds true here, namely that "Plaintiff's allegations that he was shot while no officer or other person was in the trajectory of his vehicle plausibly alleges a violation of his Fourth Amendment right." *Id.* At this point, there is a genuine dispute of fact over the circumstances giving rise to the deadly shooting and by extension, whether there was an immediate threat sufficient to justify the use of deadly force at the time the force was employed. *See, e.g., Waterman v. Batton*, 393 F.3d 471, 483 (4th Cir. 2005) ("[O]nce Waterman's vehicle passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots."); *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) ("Following *Waterman*, we have no difficulty concluding that if [officers] started or continued to fire on Williams after they were no longer in the trajectory of Williams's car, they violated Williams's Fourth Amendment right to freedom from excessive force.").

Plaintiffs also argue that there is "at a minimum, a dispute of material fact about whether [] McCourry knew that the vehicles surrounding him were police vehicles, whether the officers gave any verbal commands, and, even if they did, whether [] McCourry heard any commands." ECF 21, at 17. Accordingly, Plaintiffs maintain that "[w]ithout relevant evidence, Defendants

---

[11] After Judge Rubin granted in part and denied in part Defendants' motion for judgment on the pleadings, Defendants filed a motion under Rule 54(b) asking the court to reconsider its denial of qualified immunity. Judge Rubin denied that motion on January 10, 2025, and Defendants appealed. *See* Docket No. 23-2078-JRR, ECFs 24, 26, 37, 43.

cannot use their assertions about [] McCourry's 'non-compliance' as a justification for the use of force." *Id.* at 17–18. The video footage reveals that the cars used to trap McCourry were unmarked police cars. Ex. B, 6:48. The vehicles did not activate sirens and did not have lights, or other traditional indicators of a police car, on top of their vehicles. *Id.* While Defendants assert that two vehicles activated emergency lights, ECF 15-1 at 2, Plaintiffs maintain that a reasonable juror could conclude that McCourry "could not have seen these lights at all, as they were obscured by another vehicle and the gas pump." ECF 21, at 17. The video evidence does not resolve that dispute of fact, particularly because the Court identifies only *one* vehicle with lights activated in the video and it is entirely unclear from the footage whether McCourry could see those lights from his vantage point. Ex. B, 6:55. Clarification of these facts could create a triable issue of fact.[12] Therefore, the Court declines to award summary judgment to Defendants before the benefit of discovery. *See Boyle*, 107 F.4th at 302 (holding that where the "accounts of the moments immediately preceding the use of force, the core issue in every excessive force case, directly conflict," pre-discovery summary judgment is inappropriate); *Witt,* 633 F.3d 277 (affirming district court's denial of summary judgment where the "parties' dispute as to what actually

---

[12] Defendants are correct that "McCourry's state of mind" does not decide the issue since it is the objective reasonableness of Trenary's decision to use deadly force that is at issue. *See Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) ("The reasonableness inquiry is an objective one. To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances."). However, this does not mean that McCourry's perceptions are entirely irrelevant to the inquiry, either. *See Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015) (denying summary judgment in an excessive force case where defendants argued that the plaintiff was attempting to flee arrest but the appellate court found that "[a] reasonable jury could find that at that moment any perception by [the defendant officer] that [the plaintiff] had attempted or was attempting to flee would have been unreasonable."); *Rowland*, 41 F.3d. at 174 (denying qualified immunity where there was "some evidence" that the plaintiff resisted arrest where plaintiff "maintain[ed] that he resisted only to the extent of instinctively trying to protect himself from the defendant's onslaught.").

happened during these seven seconds is critical to the summary judgment analysis, because that dispute goes directly to the reasonableness of the troopers' use of force").

Moreover, as the Court has repeatedly acknowledged, the video has no sound. Plaintiffs argue that "Defendants assume that verbal commands were given or, if they were, that [] McCourry heard them," however, "ECF 15-3 has no volume, and there is no other evidence in the record suggesting that any verbal commands were given or heard." ECF 21, at 17. According to Plaintiffs, "[w]ithout that evidence, Defendants cannot argue that [] McCourry ignoring such commands justified the use of deadly force." *Id.* The Court agrees. *See Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) (finding excessive force where officers "never identified themselves" and plaintiff "ignored no commands"). Thus, the Court finds it inappropriate to grant summary judgment based solely on a silent video before Plaintiffs have had an opportunity to conduct discovery.

In short, there are several material disputes of fact that preclude this Court from determining the reasonableness of the force as a matter of law. Plaintiffs have requested discovery of evidence which, if available, could shed light on those issues. Discovery seems particularly important given that Plaintiffs have asserted that "there was a passenger in [the] vehicle at the time of the encounter," and "[t]here were also numerous civilian witnesses and non-Defendant police officers present." ECF 21-1, at 2 ¶ 7. Because Defendants' arguments as to Plaintiffs' claims for battery (Count I), excessive force pursuant to Section 1983 (Count II), excessive force under Articles 24 and 26 of the Maryland Declaration of Rights (Count IV), gross negligence (Count VI), and wrongful death (Count VII) all rely on the reasonableness inquiry, those claims must proceed to discovery. Based on Plaintiffs' Rule 56(d) affidavit and response brief, the Court is persuaded that, at the current stage of ligation, Plaintiffs cannot present facts essential to justify

17

their opposition and should be afforded the opportunity to obtain all discovery necessary to adequately respond to Defendants' motion. *See Boyle*, 107 F.4th at 302 ("Courts must take care to consider all contradictory evidence, which necessarily cautions against granting summary judgment before plaintiffs challenging the use of deadly force have the opportunity to conduct discovery." (citation and quotation marks omitted)).

Accordingly, Defendants' motion is denied without prejudice. If they so choose, Defendants may refile their motion after discovery closes and by the deadline for dispositive motions, which will be set in the Scheduling Order.

### B. Genuine Disputes of Material Fact Preclude Qualified Immunity.

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).

As to the first prong, whether Defendants violated a constitutional right depends upon the resolution of material fact disputes as to whether Trenary acted reasonably. As to the second prong, it was clearly established at the time of the incident that officers "violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory." *Williams*, 917 F.3d at 770.

"Ordinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558–59 (4th Cir. 2005). Further, because qualified immunity is in part designed "to protect public officials from the 'broad-ranging

18

discovery' that can be 'peculiarly disruptive of effective government,'" the Supreme Court "has emphasized that qualified immunity questions should be resolved at the earliest possible stage of litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–818 (1982)).    However, disputed factual issues may preclude such a determination. *See, e.g., Burno-Whalen v. Maryland*, Civ. No. GJH-15-564, 2016 WL 1259556, at *5 (D. Md. Mar. 28, 2016) ("[D]isputes of material fact may preclude a finding by the Court about whether qualified immunity applies, and instead convert the inquiry into a question for the trier of fact."); *Gray v. Torres*, Civ. No. WDQ-08-1380, 2009 WL 2169044, at *2 (D. Md. July 17, 2009) (noting that, in the summary judgment context, "the qualified immunity question can . . . at times require factual determinations respecting disputed aspects of [a defendant's] conduct" and therefore the summary judgment doctrine should not be "skewed from its ordinary operation to give substantive favor to the defense" (citations omitted)); *Raub v. Bowen*, 960 F. Supp. 2d 602, 608 n.8 (E.D. Va. 2013) ("So long as qualified immunity does not turn on *disputed facts*, 'whether the officer's actions were reasonable is a question of pure law.'") (emphasis in original) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)).

Here, whether qualified immunity shields Defendants from liability in this case depends upon the answer to the question of whether the deadly force employed by Trenary was reasonable. Because the justification for the force and the circumstances giving rise to that use of force are genuinely disputed, this Court cannot answer that question at this early stage of the litigation. *See Farabee*, 131 F.4th at 194 ("Whether Appellees are entitled to qualified immunity [] depends on whether their decisions are justified . . . and summary judgment on this basis is inappropriate absent resolution of that issue.").

Of course, it may be the case that, after discovery, this Court may conclude, like the Fourth Circuit did in *Waterman*, that the officers "interpreted the acceleration in the face of their show of force as the initiation [by the victim] . . . to avoid capture by using his vehicle as a weapon against law enforcement personnel," and thus there was probable cause to believe the victim posed an immediate threat. *Waterman*, 393 F.3d at 479. However, on the record presently before it—which essentially consists of a short, silent video—the Court cannot agree with Defendants that the evidence unambiguously establishes an immediate threat to Trenary, other officers, or the public, such that the use of deadly force was reasonable as a matter of law. *See Witt*, 633 F.3d at 277 (holding *Scott* inapplicable to soundless video that does not capture key disputed facts).

The Court's review of the video footage has confirmed that it is subject to different interpretations and the lack of audio makes it difficult, if not impossible, to discern key facts that strike at the heart of the reasonableness of force inquiry. In *Witt v. Bowman*, the district court declined to grant qualified immunity to defendants because plaintiff had produced evidence raising questions "of material fact with regard to his § 1983 excessive force claim." No. 08–cv–183, 2009 WL 8641706, at *5 (N.D. W. Va. Nov. 12, 2009). On appeal, the Fourth Circuit affirmed the district court's decision, finding that "the documentary evidence in this case—the dashboard video—does not blatantly contradict [plaintiff's] account of the facts; therefore, it does not establish that the officers are entitled to summary judgment."[13] *Witt*, 633 F.3d at 277 (cleaned up). As relevant here, in *Witt*, the video lacked sound and thus "[t]he viewer cannot hear whether [plaintiff] properly answered [the trooper's] questions and followed the trooper's orders (as

---

[13] The Fourth Circuit also held that "the troopers' attempt to 'rehash[] the factual dispute below' provides no basis for interlocutory appeal of the district court's order denying summary judgment on qualified immunity grounds." *Witt*, 633 F.3d at 277–78 (quoting *Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008)).

[plaintiff] claims) or resisted arrest posing a threat to the troopers' safety (as the troopers claim)."
*Id.* The same result is compelled here. The video "provides little assistance in resolving the
parties' disputes as to the facts." *Id.* Defendants' only record evidence is the video tape and an
arrest warrant that contains a date *after* the fatal shooting. As the Court already described, the
video footage does not provide "all of the necessary context that would allow the Court to assess
the reasonableness of that conduct." *Blaylock,* 504 F.3d at 414. Moreover, there are genuine
disputes of fact, and multiple reasonable interpretations, of the sequence of events, therefore
Defendants are not entitled to qualified immunity before resolution of these fact disputes. *See
Rose,* 2024 WL 3924595, at *10 ("Officer Defendants' assertion of materially disputed facts
bearing on whether [the victim's] allegedly violated right was 'clearly established' at the time
Officer Defendants shot him do not militate in favor of the outcome they seek at this time; a finding
as to qualified immunity is premature."). As such, the Court declines to grant Defendants qualified
immunity as the reasonableness of the shooting remains in dispute.

  With respect to the second inquiry—whether Defendants violated a clearly established
law—it is clearly established that the use of deadly force is unreasonable "if a reasonable officer
would have recognized when the force was employed that the threat no longer existed."
*Waterman*, 393 F.3d at 482. "[T]o determine whether a right was clearly established, we first look
to cases from the Supreme Court, this Court, or the highest court of the state in which the action
arose." *Ray v. Roane*, 948 F.3d 222, 229 (4th Cir. 2020). "In the absence of 'directly on-point,
binding authority,' courts may also consider whether 'the right was clearly established based on
general constitutional principles or a consensus of persuasive authority.'" *Id.* (quoting *Booker v.
S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017)). "[T]he Supreme Court instructs [lower
courts] 'not to define clearly established law at a high level of generality[,]'" however, "defendants

can violate clearly established law even under 'novel factual circumstances.'" *Williams*, 917 F.3d at 770 (first citing *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014), then citing *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018)). "Thus, although we must avoid ambushing government officials with liability for good-faith mistakes made at the unsettled peripheries of the law, we need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by analogy, or exercising common sense. In some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Id.* Thus, though it is clear that "to ring the 'clearly established' bell, there need not exist a case on all fours with the facts at hand," *Hunter v. Town of Mocksville, N. Carolina*, 789 F.3d 389, 401 (4th Cir. 2015), the inquiry into whether the relevant law was clearly established at the time of Trenary's 2023 shooting is relatively straightforward given precedent from the Fourth Circuit Court of Appeals that is directly on point.

As noted previously, in a 2005 deadly force case, the Fourth Circuit held that "once [the driver's vehicle] passed the officers, the threat to their safety was eliminated and thus could not justify the subsequent shots." *Waterman*, 393 F.3d at 483. However, the Fourth Circuit nonetheless granted qualified immunity in *Waterman* because it had not been previously established in the Fourth Circuit that at the time of the shooting in that case "a passing risk to an officer does not authorize him to employ deadly force moments after he should have recognized the passing of the risk." *Id.* Later, in the 2019 case of *Williams v. Strickland*, the Fourth Circuit confirmed that *Waterman*:

> clearly established that (1) law enforcement officers may—under certain conditions—be justified in using deadly force against the driver of a car when they are in the car's trajectory and have reason to believe that the driver will imminently and intentionally run over them, but (2) *the same officers violate the Fourth Amendment if they employ deadly force against the driver once they are no longer in the car's trajectory.*

917 F.3d at 770 (emphasis added). Plaintiffs maintain that "no officer or other person was in the trajectory of [] McCourry's vehicle when [] Trenary used deadly force." ECF 21, at 27–28 (citing ECF 1, at 9 ¶¶ 35, 40). As the Court already described, because discovery has not yet taken place, the video footage is the only probative evidence on this point. Defendants cite 6:59 of the video footage for the proposition that "Trenary fired a single shot into the driver's side window of McCourry's vehicle." ECF 15-1, at 3. At 6:59 of the footage, McCourry is pulling forward out of the gas station and there is no officer or member of the public directly in front of his vehicle. Thus, the Court declines to award qualified immunity at this time because if Plaintiffs' version of events is accepted and no officer or person was in the trajectory of the car when Trenary fired his weapon, then, as was the case in *Williams*, "[t]he right that the officers allegedly violated falls well within the ambit of clearly established law." 917 F.3d. at 770.

Additionally, the Court is unpersuaded by Defendants' argument that *Waterman* and *Williams* are distinguishable from the instant case because "McCourry posed a clear threat to the public," and "rapidly accelerated toward a busy highway active with morning commuters." ECF 25, at 6. First, there is no record evidence to support this argument. The video footage only captures McCourry driving away from the police officers and then out of frame. Ex. B, 6:40–7:10. Any argument that McCourry endangered the public must be supported by citation to "particular parts of materials in the record," not Defendants' bare assertions in their pre-discovery summary judgment briefing. Fed. R. Civ. P. 56(c)(1)(A). Accordingly, the Court disregards this entire line of argument. *See* ECF 25, at 6–8. The same is true for Defendants' argument that "Trenary reasonably believed [McCourry] could be armed." *Id.* at 4. Defendants cite no record evidence for this proposition, and the video footage does not conclusively establish this assertion. Thus, the Court will not consider it in deciding the instant motion.

Second, to accept Defendants' argument would require the Court to endorse the proposition that deadly force is justified whenever a suspect flees in a vehicle on, or in the direction of, a public roadway because such roads will almost always be filled with other drivers. Defendants cite no cases that endorse such an expansive view of deadly force in the context of fleeing vehicles. Indeed, though the shooting in *Waterman* occurred mid-afternoon at a toll plaza just beyond the Fort McHenry tunnel, one of the busiest stretches of highway in the state, if not the country, the Fourth Circuit still found that the use of deadly force was unreasonable "once Waterman's vehicle passed the officers [and] the threat to their safety was eliminated." *Waterman*, 393 F.3d at 474. Such a conclusion would be untenable if the mere presence of other motorists was enough to justify deadly force whenever a suspect flees in a car.[14]   Moreover, on the bare record before the Court at this time, it would be improper to conclude that Plaintiffs' assertion that McCourry drove toward a "busy road," ECF 1, at 11 ¶ 41, means that, as a matter of law, Trenary had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Garner*, 471 U.S. at 9. Accordingly, "the qualified immunity defense is unavailing, both because the constitutional rights were well-established at the time of the incident[] at issue and because there exists a material dispute of fact regarding whether conduct allegedly violative of [the

---

[14] The Court acknowledges that there are cases supporting the use of deadly force when a fleeing suspect in a car has successfully evaded officers but still poses an immediate threat to other motorists or pedestrians. For example, in *Scott v. Edinburg*, a case cited in *Waterman*, the Court of Appeals for the Seventh Circuit found that shooting at a fleeing suspect in a car after the immediate threat to officers subsided was nonetheless reasonable since the fleeing suspect "had committed a forcible felony and had attempted to run [an officer] down in order to escape or at least had acted recklessly with respect to that possibility" and the suspect "was escaping at a high rate of speed through a parking lot with twelve to fourteen bystanders and demonstrating little concern for anyone's safety." 346 F.3d 752, 758 (7th Cir. 2003). However, the proposition floated by Defendants—that deadly force is permissible whenever a suspect flees in the direction of a "busy road"—would go far beyond the parameters of *Scott* by endorsing the use of deadly force whenever a suspect fleeing in a car makes contact with a police vehicle and then heads toward a public road.

plaintiff's] constitutional rights actually occurred." *Canty v. Bishop*, Civ. No. SAG-21-3151, 2023

WL 284446, at *7 (D. Md. Jan. 18, 2023).

## C.   *Monell* and *Longtin* Claims

Defendants styled the instant pre-discovery motion as one for summary judgment.[15]

Despite this, Defendants appear to be exclusively challenging the sufficiency of the pleading as to

Plaintiffs' *Monell* and *Longtin* claims. *See* ECF 25, at 8 ("Plaintiffs have not sufficiently supported

a plausible claim for relief under *Monell* and *Longtin*."). Plaintiffs respond that "Defendants have

provided no basis for dismissal of these claims before discovery," and "for the reasons stated in

[the Rule 56(d) affidavit], discovery is required before the Court can rule." ECF 21, at 31. The

Court agrees and exercises its discretion under Rule 56(d) to deny the motion without prejudice to

give Plaintiffs an opportunity to proceed to discovery. In the Rule 56(d) affidavit, Plaintiffs argue

that the *Monell* and *Longtin* claims require discovery about, among other things:

   a.   Prior excessive force incidents involving Baltimore County Police;

   b.   Baltimore County's investigation of, and response to, prior excessive force
        incidents, including the shooting involving Det. Trenary that is the subject of
        current litigation (*See Rose v. Balt. Cnty.*, No. 1:23-cv-02078-JRR, 2024 U.S.
        Dist. LEXIS 151257 (D. Md. Aug. 23, 2024));

   c.   Baltimore County's policies and procedures concerning their body-worn
        camera program, including the alleged intentional decision to omit Det.
        Trenary's unit from same;

   d.   Baltimore County's policies and procedures concerning training officers on the
        use of deadly force;

   e.   Baltimore County's policies and procedures for training the CAST special unit
        in suspect confrontation, including the use of force to prevent escape; and

---

[15] Defendants could have filed a motion to dismiss, or in the alternative a motion for summary
judgment, but declined to do so. Accordingly, the Court evaluates the Motion under Rule 56.

> f. Modifications, if any, to Baltimore County's policies and procedures for training officers, including Det. Trenary specifically, in the use of deadly force after the Radomski shooting incident set forth in *Rose*;

ECF 21-1, at 3–4 ¶ 10. The Court is satisfied that Plaintiffs have "specif[ied] the reasons [they are] unable to present the necessary facts and describe[d] with particularity the evidence that [they] seek[] to obtain." *Radi*, 434 F. App'x. at 178; *see also Munoz v. Peerce's Operating, LLC*, No. 22-cv-1670-JMC, 2023 WL 2537543, at *4 (D. Md. Mar. 16, 2023) (allowing case to proceed to discovery where "[p]laintiffs have brought to the Court's attention additional documents, such as employee handbooks and payroll records, which may distort or completely transform the picture painted by the documents upon which Defendants currently rely"). Additionally, the evidence Plaintiffs seek is information possessed by Defendants, which also favors allowing discovery. *See, e.g., Ingle*, 439 F.3d at 196–97 ("[C]ourts should hesitate before denying Rule 56[d] motions when the party opposing summary judgment is attempting to obtain necessary discovery of information possessed only by her opponent.").

The Court declines to further analyze Count III (*Monell* claim) or Count V (*Longtin* claim) on a motion for summary judgment given that Plaintiffs have adequately shown a need for discovery through their Rule 56(d) affidavit. *See* Fed. R. Civ. P. 56(d) (stating that if the nonmovant is able to identify specific reasons why it cannot present facts essential to support its opposition in its Rule 56(d) affidavit, "the court may: (1) defer considering the motion [for summary judgment] or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order").[16]

---

[16] As the Court has explained, summary judgment is not appropriate at this stage of the case. The case will proceed to discovery; however, Defendants are free to file a motion to bifurcate discovery if they so choose. *See Johnson v. Balt. Police Dep't*, 500 F. Supp. 3d 454, 460 (D. Md. 2020) (explaining that cases containing *Monell* claims are "good candidates" for bifurcation because "in most cases, a plaintiff's § 1983 claims against a municipality or a supervisor 'hinge on his ability

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion, ECF 15, is denied without prejudice.

A separate implementing Order will issue.


Dated: July 29, 2025                                    /s/
                                          Brendan A. Hurson
                                          United States District Judge

---

to show that [individual defendants] violated his constitutional rights.'" (citing *Dawson v. Prince George's Cnty.*, 896 F. Supp. 537, 540 (D. Md. 1995))).